Good morning and welcome. Thank you for being with us today. Judge Sung and I would like to thank Judge Gilman from the Sixth Circuit for graciously serving with us and helping us out in the Ninth Circuit. So thank you to you and your chambers for being here and for helping us. Pleased to be here. All right, the following cases have already been submitted on the briefs. United States v. Ramirez Espinosa, United States v. Garcia, United States v. West, Finney v. Howey, and the remaining three cases will be set for argument. We'll hear the first two, then we'll take a 10-minute break and hear the final case. So if counsel for Bentle v. Farmers Insurance, if you are ready to proceed, let me ask Mr. Angel, how much time would you like to reserve for rebuttal? Five minutes? All right. My name is Jeffrey Angel with the Angel Law Firm. I am born, raised, and practicing in Bozeman, Montana. I represent Robert Bentle. And if I can briefly provide a short summary, I'll then answer the questions the Court set for this hearing. An insurer cannot use payment of undisputed benefits to defeat coverage limits, to defeat other coverages under a policy, or to defeat the Unfair Trade Practices Act or bad faith liability in Montana. Mr. Bentle, for months and for years, paid his premiums because he wanted $250,000 in UIM benefits and he wanted $10,000 in MedPay benefits. It is undisputed, Mr. Bentle, I believe he was 72 at the time of the accident, was injured by a vehicle. He went to his insurer and they agreed, consented to allow him to obtain the $25,000 benefits from the under or the at-fault insurer. He then made claims for UIM and MedPay and the insurer assigned adjusters. The fact is, this case stands for the issue of an insurer should pay what it owes. What the insurer did in this case was tell Mr. Bentle that they found no injury was caused by the accident and that they found no medical expenses related to the accident. We found out both of those were untrue, but they offered $30,000 under his UIM and did not condition that on release. They expressly said, this does not require a lease of claims. He accepted. They paid the $30,000 and he sued for breach of contract and for- Wait, wait, wait. You wrote a letter saying that your Mr. Bentle quote had agreed to accept the $30,000 to settle his medical payments and underinsured motorist claims. Settle but not release the insurer from further liability. And here's what the semantics thing. The court focused on the word settle and said, well, that means release. The problem is the court wasn't looking at, and for an accord and satisfaction, you have to look at the conduct of all the parties. The insurer- But then look at the insurer's letter. We are including a release for Robert to complete, but please note this is not a requirement for the settlement, simply a request. Yes. They did not need a release to make the payment. In Montana, an insurer cannot condition undisputed payments on a release. Full stop. That's for first party and third party benefits. That's disputed here. They felt there was no causation between what he was claiming, you know, his medical problems were because he had a preexisting condition with his shoulder. Well, but remember this case was decided on summary judgment and this adjuster actually prepared an evaluation. So we know what they were thinking. They're was that he had between $140,000 and $210,000 in damages. She estimated the medical bills at $100,000. She didn't know what they were because she didn't collect all the medical records and bills. But you did not, you refused to give them a medical records authorization so they could get the documents themselves, right? That's what they assert in their answering brief, and you remained silent in your reply brief. So they were sort of at your mercy as to what documents you would provide. And it looks like the EMS record from that accident where Mr. Bentle's stroller or cart was hit by a car in the parking lot of a retail outlet, that that was not provided until after the settlement. Why did you not provide that right away? We provided the enough medical records to establish the limits of med pay and to establish a high enough medical to where they would see this as a claim worth the limits, which they did. But if you thought that the cart accident was the cause of the injury, why would you not provide that EMS report right away? We didn't have it. And I didn't know they didn't have it. Okay, so answer the question. Did you refuse a medical records authorization so that the insurance company could get the records themselves? It's done routinely. We collect the records for them. And we collected enough records for this adjuster to see $240,000, $210,000 in damages. No, but that's not your argument. In your briefs, your argument is that the insurance company had the obligation to go out and get this data, and they did not. And now you're saying, no, they don't have the obligation to get that data. They have to get everything from us, the plaintiff. Isn't that a different argument than what you argued in your briefs? My understanding is that they had all the medicals they wanted to evaluate the case, which is how they placed such a high value on it. Well, of course, the limit on the medical payments was only $10,000, right? So they had more than enough to pay out the medical benefits because they had, she said, this is Adjuster Goodwin, the UIM adjuster. She said that they had, I believe it was $97,000 in medical bills. Okay, this is the Goodwin letter of September 10th of 2020. There was no care directly after the loss, at least none that was presented. You did not provide any EMS records to indicate they responded to the scene or MRI the following day, which was already scheduled prior to this loss. There's maybe only one note of the shopping cart incident in all of the Roberts' records. The workers' compensation IME never even mentions this loss and points to the fallout of the bed, which happened before the cart accident. So at least it looks like even Ms. Goodwin is asking for documentation to link the medical payments with the cart accident. Yes. And the breach of contract and the bad faith claim never fully developed because the court kicked it out on summary judgment. The court said, there is no claim to investigate because they paid you something. And that's what takes us to McVeigh and the later case of Byorth, which talks about that. It's Byorth v. USA 216, Montana 302. These cases talk about the fact that just because you make some payment does not excuse what you've done. Well, those are in cases where there was a denial of a claim before any investigation or reasonable investigation occurred. Correct. Those are cases where some payment was made and the Supreme Court said that's not going to excuse full payment. Those cases, though, predicated on the fact that first the insurance company denied without doing a reasonable investigation. And then only after there was, after the initial denial, there was some investigation and a later payment. And the court said that didn't cure the failure to investigate before denying. Here, it looks to me like we have a fairly substantial amount of investigation. And I also don't see a clear denial. The MedPay adjuster flatly denied the claim. Where? Can you show me where in the correspondence there's something that says we are denying your medical payments claim? That, I don't believe that's in the record on appeal, but they paid nothing. It's his testimony. Well, there's a difference between, I mean, they ultimately resolved both the medical payments and the underinsured motorist claims. But I don't see anything in the correspondence from the insurance company saying we are denying your medical payments claim. Is there anything in the record? There is. They did issue multiple denial letters. Where in the record do they say we are denying your medical payments? I don't believe it's in the record on appeal, but they did deny those. But you can't point me to anything in the record. What about in the record below? In the record below, there's a letter from Mr. Goetz stating that they are not paying any medical record, medical payments. A letter to your client? To me. To you. And we deposed both of them after and asked either of them if anything was paid for MedPay. And they both were consistent that nothing was paid. Well, I understand they didn't classify a payment as coming from the MedPay claim after they settled the claim. But I'm saying at the start of their correspondence or somewhere in their correspondence with you or your client, did the insurance company say we are denying the medical payments claim or anything to that effect? Yes, absolutely. OK. Can you tell me when and where? I cannot quote you the date and time. Well, I think it's in the deposition of, is it Goetz? Jacob Goetz? Jacob Goetz was the MedPay adjuster. I see on ER 48, you're asking, I mean, when you immediately adjusted the case and denied coverage, is that true to say? And Goetz says, we denied the relatedness of the bills, not necessarily coverage. And you follow up, OK, so you weren't fussing about coverage, but you felt you think there was that you had not suffered an injury that caused medical care that resulted in a charge to you, right? And Goetz says, correct. Yeah, there was no question that what they were telling us in the letters that have been quoted to me was not true about what was going on behind the scenes. They were evaluating this claim. They were finding damages significant, more than $200,000 in damages. But then they were telling us we don't see anything related. Before, I just want to, is that what you're relying on, that deposition testimony for your assertion that the insurance company communicated to you or your client during, when they were processing the claim, that they were actually denying medical payments coverage? That's the whole of what you're relying on. Full stop and Julie Goodwin's testimony. But that was a deposition, though, that was taken in the course of this litigation, is that correct? So that's not actually information that was relayed to you or your client at this, when they were processing the claim, is it? Well, when they were processing the claim, they conveyed to us in, you know, in certain terms that they were- That they were disputing whether there was a causation, right? But that's different to me from, and he draws the distinction between a dispute about causation and a flat out denial, right? To me, it's one thing for the insurance company to say, we're not sure whether we should pay this claim, please provide us more evidence. That's what they're supposed to do in investigation versus saying, we're not paying. I am at a loss here because I am 100% confident Jacob Getz's letter saying that they are denying any coverage under MedPay is in the record. I just can't quote it for you right now, but I know it's there. And I know we received more than one of those. And the point of deposing them was this waiver of all claims. And I mean, it really gets to the questions whether they paid anything under MedPay. They didn't. The check itself, which is in the record, shows it was only UIM they were paying. They both testified, Adjuster Goodwin and Getz, that they weren't paying anything for MedPay. The release that Goodwin said, you know, you don't have to release the claims. Let me ask you, before we run out of time, two questions about the reasonable investigation. First is, if you were to prevail on that claim, what would your damages be? Second is, that claim not only depends on the refusable pay claims that, you know, Judge Sung was raising, but it says, without conducting a reasonable investigation based upon all available information. And so, if you were not providing the EMS for whatever reason, and all the documentation that the insurance company had seems to indicate that the injury and the pain and suffering of Mr. Bentle is from his workers' compensation incident exacerbated by him falling out of bed before this cart accident, how then does that qualify as an unreasonable investigation? Well, it qualifies as an unreasonable investigation because it's ignoring what they really believed. Judge Goodwin's evaluation shows what they really believed. They really believed he had injuries from this, and they valued those. That could be litigation risk, right, of just resolving a claim, right? They knew that there was probably going to be a lawsuit. He had expenses from his workers' compensation injury, falling out of bed, exacerbating the injury. But what are your damages for a reasonable investigation claim? They, in Montana, they start with the grief, anxiety, and stress of having to go through an adjustment process. So how much, what is that in this case? Whatever a jury thinks it is. We've had one a while back where the jury gave $325,000. They didn't pay a woman's bills for six months. And the jury wasn't going to stand for that because there was no reason they shouldn't have been paid. The same is true here. Adjuster Goodwin knew those medicals were caused by it. She placed a specific down-to-the-penny dollar value on them. She even found lost wages. She then turned to us and told us she found no related medical expenses or injuries, although secretly, she valued the claim at $140,000 to $210,000. They just plain weren't- You're basing that on her notes, is that about the case? That's her evaluation. And on summary judgment for the first issue, which is the contract claim, they had not given us that document. And so the deposition had to be suspended. So we couldn't provide that to the court. After the court let the bad faith claims go forward and stopped the contract claims, we were able to re-depose Adjuster Goodwin. And we discovered the existence of that document, which they got us that day. And so we were able to find out what was really going on behind the scenes versus what they were telling us. And when you talk about reasonable investigation, you have to remember, they sent all the medical records to a medical records reviewer and didn't tell them anything about the accident. And then they told us, well, see, he doesn't see anything related. But he said, I didn't know anything about an accident. They didn't give me any details. I didn't know when anything. And I specifically asked him, was it reasonable for them to look at your report and think that there was no related medical expenses? He said, absolutely not. I didn't know anything about an accident. So we believe that the failure to pay MedPay can't be cured by a payment under UIM. And McVeigh and the other cases support the idea that even if they made a payment, that can't excuse failure to investigate. That stuff we can only discover in the lawsuit. And since we were picked out on summary judgment, we only have a partial picture at this point. All right, you have six seconds left, but I will give you two minutes. Good morning. And may it please the court, Alex Smy, along with Nick Pagnotto of Williams Law Firm, on behalf of MidCentury Insurance Company and Farmers Insurance Exchange. The district court correctly issued two summary judgment orders, first disposing of the contractual case on summary judgment with the court in satisfaction, and then later disposing of the UTPA claims on a separate motion in what amounts to a Celotex examination. You don't think it was legal error to find that settlement cures the reasonable investigation claim? As to, well, if we take a step back, the settlement as to the MedPay? Well, let's look at the two cases in our focus order. Don't they say that a settlement cannot cure a reasonable investigation claim? Lorraine and McVeigh? Both of those cases involved the denial of coverage. McVeigh involved UIM coverage where the insurance company said the claimant insured was at fault for the accident. Therefore, there was no coverage because... No, McVeigh just said that she had been majority at fault, and then the court said that rose to the level of a denial. Yes. So there would be no insurance coverage available because under the insurance coverage grant, there's no underinsured motorist claim when the claimant is at fault. And same with Lorraine. It was a health insurance policy where the insured saw benefits for an amputee. The insurer didn't issue coverage. Here, MedPay coverage was never denied. As to coverage itself, benefits were not paid because there were no medical expenses provided that were established to this event. We talked about the EMS record, or I heard that discussion earlier about the EMS report. That wasn't provided until later. The medical expenses that then occurred, this... Okay, well, this is Lorraine. Neither the mistaken denial nor Fortas' conduct after the denial are at issue here. Well, that's the cure, right, by the payment. The sole issue in this independent cause of action is whether the investigation itself was objectively reasonable. We hold that both the allegedly mistaken denial and Fortas' ultimate payment are irrelevant in determining liability as to this claim. So if the cure is ultimate payment and that's irrelevant as to liability to reasonable investigation, doesn't that mean that you can have a reasonable investigation claim that is independent and separate from whether you've paid? If coverage was denied, there has to be a refusal to pay. He did deny coverage. I mean, he denied paying the medical benefit until later. I mean, with the settlement, I mean, you know, it may not have been... You're not saying, oh, we don't cover medical payments, but you're saying these medical bills aren't causally related to the accident, so we're not going to pay. There were no medical bills to pay that were outstanding unrelated to the workers compensation claim. The claimant did not go to the emergency room after the shopping cart incident. He had an appointment for an MRI the next day that was scheduled beforehand, and that's why when you look at Dr. Ballin's report, Dr. Pino's report, they're looking at the evidence. There are no medical records even referencing the shopping cart incident. Under Montana law, the insured has the burden to show in the first instance that the claim is covered within the basic scope of the... His testimony could be enough, right? You don't have to have a doctor. If it was UIM coverage, because UIM coverage covers things like pain and suffering, right? The insurance company in the UIM claim steps into the shoes of the TORP feeser. Medical payments coverage is specific to medical expenses. It doesn't have the same broad language as to covering all the damages that you could recover from the TORP feeser as UIM does. So there are two different coverages in that regard. You have to have a doctor's bill is what you're saying for the medical... Yeah, our argument is you have to have those medical expenses that are causally related to the events in question for med pay. Under UIM, I agree with you. It's much broader. You can recover all those same damages. The insurance company steps into the shoes of the TORP feeser, which is why folks purchase UIM coverage. It's when the TORP feeser doesn't carry it out. But didn't you turn a blind eye to the causation? Look at what Mr. Bentle says that you didn't interview anyone with knowledge about the accident. You didn't know the speed of the vehicle, the severity of the collision, what happened to Mr. Bentle in the collision, why EMS was called, what EMS found. You didn't interview Mr. Bentle. You didn't gather the EMS report. You didn't interview the at-fault driver, the Bozeman police, the Bozeman fire EMS. It didn't interview any witnesses to the accident. You didn't seek any additional information, clarification, or opinion from any of Mr. Valen, didn't provide Dr. Pino with any information about the accident. So why is that a reasonable investigation? So they tried to get medical records through a medical record authorization. As to calling medical providers, I don't think that they could do that absent an authorization. We have things like HIPAA. There's essentially state law implications of contacting somebody's medical providers, ex parte, to discuss their history. And also it goes back to the insured under Montana law has the initial burden to show that coverage is within the basic scope of the policy. So it's insured's burden to provide that information. If this is a case where we were relying on an exclusion, then absolutely. It's the insurance company's obligation to go get information to show that that exclusion applies. But here we're dealing with the initial scope of coverage. They're examining everything that's provided to them. They asked for medical records. That was not provided. Mr. Bentle was represented by counsel when he made the claim. And one point as to the settlement value, and this is on ER 16, Ms. Goodwin's range was $0 to $25,000 for this claim. And ultimately what was paid was $30,000. So how do you explain the $140,000 to $210,000 estimate of the value of the claim? I don't know if that's referring to loss reserves or other aspects, but this was her range of value for this claim. And when you're looking at total value of a claim, that's assuming that there are no causation. If we take everything out, the prior injury, all that information that we had in this case, which made this a disputed claim, this is not a Ridley-type scenario for the 1997 case that my colleague, I think when he's saying the settlement discussion that he's referencing. There were all sorts of causation hurdles here. This is not an undisputed medical damages case. And also going back to your point as to subsection 4, as to a reasonable investigation based upon all available information, the appellant in this case bared the burden of persuasion at trial under his UTPA claims. So if we look at 56C1B, which embodies Celotex, the appellant has to come forward with evidence showing a fact dispute if the case were go to trial. But Lorraine says that whether an investigation is reasonable is a jury question. If there's conflicting evidence, absolutely. But we still have to go back to Celotex in Rule 56 that applies the procedural standards for that. There can be summary judgment on various normally fact-intensive inquiries. If, for example, a product defect case, if there are no disputed facts, those should get decided, or no evidence. All right, but the district judge didn't deal with whether there was or was not a reasonable investigation. So we don't know what the district judge would have found, whether there were disputed facts or not, do we? The district court in the second order below determined that coverage was not refused. That's correct. Yeah. And if he's wrong on that, would we have to reverse and remand for at least him to decide whether there was a reasonable investigation then of the medical payments? It could still potentially affirm on an alternate basis, alternative basis. And what would that alternative basis be? That there was no evidence of an unreasonable investigation when we look at Celotex. And under the UTPA, it's the appellant's burden of proof to come forward with evidence at the summary judgment stage, because the appellant bears the burden of persuasion at trial. But how would he have been able to do that without taking the deposition of Goodwin? Ms. Goodwin was deposed twice in this case. Was she deposed prior to the motion for summary judgment? She was deposed initially early on in the case while the contractual claims were still pending. Then summary judgment was granted on the contractual claims. Later on, she was deposed again. There was initially a discovery issue with redacting loss reserve and related information because the contract claim was still open. So there was an objection based on Montana law that that information is privileged when there's an open contractual claim. Why do you not rest on refusable pay claims? Would that be yet another alternative basis to affirm the district judge? Yeah, and that's the basis primarily in our briefing, is that this was not a refusal to pay the claim. Just now you said, no, just say that there wasn't evidence of an unreasonable investigation. Which one? I'm asking you, which of your child you prefer, right? You refuse to pay claims or no evidence of unreasonable investigation? And why is there not a material factual dispute as to either? So there isn't as to refusal because the appellant has to, under medical payments coverage, if we look at the scope of that coverage in the policy, there has to be a refusal to pay medical expenses that are causally related to the shopping cart incident. We need to have those medical expenses. We need to have a doctor say, hey, I'm treating this person because he was injured in the shopping cart incident. Then the appellant or his counsel provides that to the insurance company and says, hey, we have these outstanding medical expenses from this incident. Please pay under the policy. Then the insurance company in that instance, yes, has an obligation, but they weren't provided that type of information in this case, along the EMS report was not initially provided. And then the other medical treatment was related to the ongoing workers' compensation claim. So what was not provided to you in terms of medical records other than the EMS report? There were other medical records provided through counsel, but my point is those records are going towards the ongoing workers' compensation injury. That's why the two doctors did not find any reference in the materials to the shopping cart incident when they examined the records with their reviews. I'm a little bit confused by your position because it seems to me the whole problem with the post-accident medical care is that it's at the time that this correspondence is happening between the insurer and the insured, it's not clear what the cause because there's multiple and that's I think there's multiple potential causes. It could have been the pre-existing workers' injury. It could have been the fall out of bed or it could have been the accident or some combination of the above. And that what my understanding is, Ms. Midcentury's position was we can't tell yet what the cause was of these subsequent medical care. You need to give us more proof essentially of causation. And then essentially instead of more proof of causation, there was a settlement. Is that a fair characterization of what occurred? And would that apply to both the medical payments and the UIM claim or just the UIM claim? So that correspondence was ongoing between the insurance company and counsel. I would, as to the two alternate causes, and that's something my colleague pointed out in his correspondence, it goes back to the burden of proof. And under Montana law, the insured has the burden of proof in establishing the claim falls within the scope of coverage. The insurance company doesn't have the affirmative obligation to say, well, we presume this is all related and now we have to go do an investigation to disprove this material. And that didn't really come up in the briefing. So we didn't we didn't discuss cases on the burden. But one is Farmers Insurance Exchange v. Wessel. It's a 2020 case. Farmers Exchange? Insurance Exchange v. Wessel, W-E-S-S-E-L-L. Versus Wessel? Yes. And that case is one example talking about the burdens that cites Montana law on a 2016 decision going to a 2005 decision. And those burdens apply in all insurance disputes. The insured has the initial burden to come forward and show that the claim is within the basic scope of coverage. If the insured does that, that's usually a generally broad pitch. Like, I was injured in this accident. That's usually enough under most policies. Assuming that's done, then the insurance company has the affirmative obligation to say, if an exclusion applies, that, yeah, but maybe your claim falls through this, but we have additional language in the policy that takes coverage away. Then there's a third step that can sometimes come up, and that's an exception to an insurance, to an exclusion that then takes the burden back to the insured. So where in here, though, I mean, why wasn't that burden met here with you saying there's an accident occurred and then I have these medical payments? You're saying where there's a there's a question of causation that the burden is still on the insured. And does that, does this Wassell case specifically address that? That case was on duty to defense, so factually it's a little different. Here, the burden was on the insured to have medical opinion testimony involved, and that's done through doctors, physicians, whether retained consultants or treating providers, to say, yes, the injury is in this treatment. It's from this event. And when we look at the materials here, like the MRI, he didn't go to the ER the day that this happened, says, I'll go to get my MRI. That was scheduled for the ongoing workers' compensation claim for which he had surgery, which he recently fell out of bed and reported he was having all sorts of trouble with range of motion and it hurt just like before he had surgery. So that's a causation hurdle that the insured has the initial burden of establishing. And do you have any case authority on that? Are you just saying you're extrapolating from the existing case? I believe that would be the analysis of looking at Montana law on the burden framework in insurance cases. I, I can't think of a medical payments case in Montana involving applying that framework to this factual setting. So you're saying if the insurer doesn't meet this initial burden to show the coverage covers the claim, you can never have a refusal to pay claims. Is that your position during that period before that initial burden is met? It depends on the policy language. That would be true with, with medical payments coverage. Yes, because medical payments coverage has initial two, two couple things in the insurance coverage. First, you need that event that was within the policy period, but then you need medical expenses that are causally related to the event in question. Okay, so you're resting on the terms of the coverage, not any express correspondence with or lack thereof. Well, as to the court and satisfaction, that's dependent on the, on the, the letters, particularly the October 20th correspondence between the parties. So I guess I went up to put a finer point. Are you conceding that just not paying the medical payments was a denial or, because my question, I don't see in the correspondence anything saying we're denying your medical payments claim. It seems more like they're focused on questioning causation. So my questions to your opposing counsel were, where did, where did mid-century actually say they were denying the medical payments claim as, as opposed to just ask for more documentation of causation or offer a settlement in exchange for resolving the causation dispute? So I guess to me, there's a question of maybe the insurance company never flatly denied medical payments coverage, rather asked for more information about causation, but it doesn't seem like you're resting on that. No, and that's true as well. It wasn't a denial of coverage because had Mr. Buntle later come back, went and talked to his treating physicians and said, here's, here's medical opinions from these physicians that say, because of the shopping cart incident, I've acquired these medical expenses, then the insurance company needs to consider that. And this would have been within the scope of coverage. But it was open. There was a possibility he could have responded to the letter saying, here's additional evidence, and then the claim would have been paid. Yes, then it would have had to been considered. But you just said, no, it's true. So that's confusing. Oh, sorry. So are you saying there was not a refusal or a denial of coverage? Yes, I'm saying there was not a denial of coverage because he could have went and provided that information from his treating providers, submitted it to the insurance company, and then they would have had to consider it. It was still an open claim in that regard until it was resolved by the payment in October. OK, any further questions, Judge Gilman, Judge Song? All right. Thank you. Give you two minutes. Go ahead, please. Thank you, Your Honor. I have two points I'd like to make. One, I was asked about whether there was related medical expenses. I mean, that's a question. And remember, this is summary judgment. No questions were answered. The court simply found, as a matter of law, that the MedPay claim was precluded because they made a partial payment under UIM. But the insurer, and this is Excerpt of Record 15, found $90,375.35 in related medical expenses. That's a fact. The adjuster for MedPay, Getz, then took those medical expenses and bills that we provided, it was the first $60,000 after treatment, and he sent them to a medical provider with no information about an accident whatsoever. Nothing. Not what happened, where it happened. Who it happened with. And asked questions about, are these medical expenses related to an accident? And all the doctor kept saying is, I can't tell. I don't know anything about an accident. Isn't the doctor supposed to use their expert judgment by looking at medical records? Or you want the insurance company to be whispering in the doctor's ear all this information? I guess I'm a little un-sure. Sure. If you give a doctor some medical records and say, are these related to an accident on October 12th? He can't answer if he doesn't know something about an accident on October 12th. I mean, just saying the words accident October 12th is no good. But adjuster Getz told him that, and I asked the doctor specifically, Dr. Pino, would it be reasonable for anybody to rely on your report and exclude that accident? But why do the medical records you provided not mention the October 2 accident? Well, they do. Isn't that, isn't that, that's not, his report notes that none of the information in the records that were provided to him discuss the motor vehicle accident of October 2, the shopping cart accident. And I'll answer that. The MRI, the day after the accident, noted an intermediate grade strain tear in the arm, in the shoulder. So it was a new injury found the day after the accident. Later imaging found. That the whole, the appointment was scheduled because your client fell out of bed and had a preexisting injury. Right? No, the appointment was not scheduled. They keep saying it was scheduled because he fell out of bed, but that's nowhere in the record. They scheduled that as a three month followup from the repair. He wasn't scheduled because of the act card accident. No, no, no. Because it was the next morning. But they found an intermediate grain strain tear on the shoulder. They found loose hardware in the shoulder. Nobody attributed that to a fall out of bed. That's something. You're not disputing that your client fell out of bed shortly before the accident, correct? Not disputing that that happened? Correct. But there was. It's undisputed that your client also fell out of bed. He fell out of bed. Shortly before the accident. He landed on his back. He didn't report any problems. He was talking to his PT. The insurer here has been able to use a small portion of UIM benefits to defeat the limits of UIM coverage. Even though when they made the payment, they said, you're not going to have to release anything. This is a voluntary payment because we see undisputed benefits. But how come, are you disputing that Bentle's treating providers actually said the causation was the shopping cart incident in the parking lot versus his worker's comp injury? The surgery and falling out of bed? Nobody asked. Which. They're not. Right. But this is, I guess these are medical doctors. They're using the medical expertise. They've been treating him for a significant amount of time, right? So in their expert judgment, they are not attributing the medical expenses and injury to the shopping cart accident. The treating providers. There's no discussion about that. One way or the other. They don't express an opinion because they were never reached out to. Well, why wasn't it your responsibility to get that medical opinion? I mean, you didn't provide an authorization. Then you're saying that the insurance company says there's this question of causation. Can you provide us more evidence? And instead of saying, sending your client to the doctor and asking them, can you give me a medical opinion about causation? You offer to settle the claim. We asked them to contact the doctors. We also knew that they were sending the records to an expert. Did you provide the authorization that would enable them to have that discussion with these providers? Typically, they wouldn't. No, they didn't have an authorization, but they probably wouldn't have needed it then. They could have sent the questions to us to get to the doctor. We knew they were getting an opinion from the doctor. Did you propose that at any point? Send us a list of questions to ask the provider? We proposed that they contact the doctor. Yes. I mean, they can't contact someone's doctor directly under medical privacy laws without authorization. Well, the doctor might say, can I answer these questions? But a lot of times they don't. But the point is, Valen's a good example. So one thing that's not maybe clear is Mr. Bentle treated with the guy that fixed his shoulder up till the day of the accident. He switched to another doctor, not Dr. Valen, and that doctor took over care from that point forward. So there was a change in doctors at the accident. Accident, the falling out of bed, the worker's compensation accident, or the shopping cart. Yeah, and Dr. Valen wasn't a treating doctor. He didn't treat anybody on either side. He was just asked some questions by a work comp adjuster. And the work comp adjuster didn't care anything about a car accident. So he didn't answer any questions about that because he wasn't asked any questions about that. Dr. Pino was specifically asked about the accident, but he had no information. I mean, on summary judgment, there's an assumption that these things weren't done, but the record was never fully developed. And so we would ask that Mr. Bentle be allowed to pursue his contract claim because he has limits that have not been touched and some that haven't been exhausted and to establish bad faith. All right. You're four minutes over your time. Thank you to both counsel for your helpful arguments.
judges: Gilman, KOH, SUNG